UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TASHANA CHAMBERS and LAWRENCE
CHAMBERS,

                          Plaintiffs,

          -v-


NORTH ROCKLAND CENTRAL SCHOOL
DISTRICT, NORTH ROCKLAND CENTRAL
SCHOOL DISTRICT BOARD OF EDUCATION,
DODGE R. WATKINS, in his individual and official
capacity as former Superintendent of North Rockland
Central School District, BRIAN MONAHAN, in his
individual and official capacity as Superintendent of
North Rockland Central School District, and
DAGOBERTO ARTILES, in his individual and
official capacity as Assistant Principal of North
Rockland High School,

                          Defendants.

Case No. 07-CV-8190 (KMK)

OPINION AND ORDER

Appearances:

Mary Elizabeth Brady Marzolla, Esq.
Brian A. Kelly, Esq.
Stephen Patrick Barry, Esq.
Feerick Lynch MacCartney
Nyack, New York
*Counsel for Plaintiffs*

Lewis R. Silverman, Esq.
Caroline B. Lineen, Esq.
Samantha Vélez, Esq.
Rutherford & Christie, LLP
New York, New York
*Counsel for all Defendants*

KENNETH M. KARAS, District Judge:

        Tashana Chambers ("Tashana") and Lawrence Chambers (collectively, "Plaintiffs")

bring this action against North Rockland Central School District ("the District"), North Rockland Central School District Board of Education ("the Board"), and individual Defendants Dodge R. Watkins ("Watkins"), Brian Monahan ("Monahan"), and Dagoberto Artiles ("Artiles") in their individual and official capacities (collectively, "Defendants"), under 42 U.S.C. § 1983 ("§ 1983").  Plaintiffs allege violations of Tashana's Fourteenth Amendment due process right to bodily integrity.  Plaintiffs also assert state common law claims for negligence, breach of special duty, breach of fiduciary duty (asserted against only Defendants Watkins and Monahan), and loss of services (asserted only by Plaintiff Lawrence Chambers).  Defendants move for summary judgment.  For the reasons stated herein, Defendants' motion is granted.

I. Background

A. Facts

The relevant facts, which revolve around an ongoing, in-school dispute between several students that eventually culminated in a violent episode at a high school graduation ("the graduation incident"), are taken mainly from the Parties' Local Civil Rule 56.1 Statements.  In 2004, Tashana moved with her family from the Bronx, New York, to Rockland County, and enrolled as a student at North Rockland High School ("NRHS"), a public school within the District.  (Defs.' Local Rule 56.1 Statement of Facts ("Defs.' 56.1") ¶¶ 6, 8-9.)  Early in the 2005-2006 school year (Tashana's senior year), Tashana had a confrontation in school with three girls — Unique Vaughn ("Unique"), Brittney McCloud ("Brittney"), and "Amanda" — which started after Tashana pointed to Amanda and complimented her hairstyle.  (*Id.* ¶¶ 20, 23; Dep. of Tashana Chambers ("Pl.'s Dep.") 31:15-24.)[1]  Following this initial confrontation, Unique,

---

[1] During the 2005-2006 school year, Unique was an eleventh grade student at NRHS. (Defs.' 56.1 ¶ 81.)  Up until the graduation incident that school year, which is discussed in more

2

Brittney, and Amanda continued to bother Tashana, which spurred Tashana to complain to

Defendant Artiles, the assistant principal assigned to Tashana's grade.  (Defs.' 56.1 ¶¶ 19, 20.)

Tashana told Artiles that the girls "were constantly following me around, yelling at me, taunting

me, and [] were threatening me," and that they "made my life a hell."  (Pl.'s Dep. 30:7-9, 32:6.)

The girls would call Tashana a "ferret" and a "bitch," and Tashana, in turn, called the girls

"ghetto."  (Defs.' 56.1 ¶¶ 21-22; Dep. of Dagoberto Artiles ("Artiles Dep.") 33:24-34:3; Dep. of

Diane Robinson ("Robinson Dep.") 50:10-15.)  During this conversation, wherein Tashana

initially informed Artiles of the issues she was having with these other students, Artiles listened

to Tashana, but he did not indicate whether he was going to take any disciplinary action against

the girls.  (Defs.' 56. ¶¶ 24-25.)

---

detail below, Unique had not been involved in any documented physical altercations, but had
been suspended from school for cutting detentions and for saying "don't look at me" to a teacher
in a threatening tone.  (*Id.* ¶¶ 82-83.)  Brittney was a tenth grade student at NRHS during the
2005-2006 school year.  (*Id.* ¶ 84.)  Prior to June 26, 2006, Brittney had been disciplined for
illegal absences, cutting detentions, and disruptive behavior, and eventually withdrew from
school in June 2006, before graduation.  (*Id.* ¶¶ 84-85.)  Brittney had also been suspended once
during the 2003-2004 school year for fighting with another student, and was identified by the
District as having a propensity towards violent behavior.  (*Id.* ¶ 86; Pl.'s Resp. to Defs.' Local
Rule 56.1 Statement of Facts ("Pl.'s 56.1") ¶ 84.)  Denise McCloud ("Denise"), Brittney's sister,
was a ninth grade student at Fieldstone Secondary School, within the District, during the 2005-
2006 school year.  (Defs.' 56.1 ¶ 87.)  Denise was suspended from school from November 3,
2005 through February 28, 2006 for fighting, was prohibited from entering school property, and
was referred for psychological, psychiatric, and neurological evaluations.  (*Id.* ¶ 88.)  As a result
of her suspension, it was determined that the District would provide a new school placement for
Denise for the remainder of the school year.  (*Id.* ¶ 89.)  Denise had also been suspended during
the 2004-2005 school year for arguing with a classmate, and for slapping another classmate.  (*Id.*
¶ 90.)  Denise's psychological exams revealed that she, like her sister, had a history of, and a
propensity towards, violent behavior.  (Pl.'s 56.1 ¶ 90.)  Although Denise did not attend school
with Tashana, Unique, Brittney, or Amanda, she was involved in the events that took place at
graduation.  The Parties have not provided similarly detailed information about Amanda;
however, she was not identified as a participant in the graduation incident.  (Defs.' 56.1 ¶ 80.)

However, Artiles testified that Tashana came to him in October 2005 to "file[] a complaint [about] a group of student[s] calling her names." (Artiles Dep. 30:13-14.) In fact, Artiles specifically recalls that Tashana complained that these other students had called her "small mouth." (*Id.* 30:16.) After receiving this complaint, Artiles began an investigation and, working with Steven Riback ("Riback"), who was the 11th grade principal at the time, Artiles was able to identify the students at issue. (*Id.* 31:13-17; Defs.' 56.1 ¶ 42.) Artiles and Riback brought these other students (Unique, Amanda, and a third student whose name Artiles could not recall) to the office and questioned them about why they were "talking about the physical attributes of [Tashana] in a negative way." (Artiles Dep. 31:18-20; *see also id.* 31:23-32:13.) The students informed Artiles and Riback that Tashana was calling them "ghetto." (*Id.* 31:20-22.) Artiles and Riback told these students "clearly to stop the name calling, that it was not appropriate, and that [they] were not approving of such behavior." (*Id.* 34:7-9.)[2]

Some time during the middle of the school year, Tashana and Unique once again became engaged in a verbal altercation in a school hallway that involved yelling and name-calling, and which was broken up by a teacher, Amanda Gunning ("Gunning"). (Defs.' 56.1 ¶¶ 26, 27.) After this incident, Artiles met with Tashana, Tashana's friend Diane Robinson ("Diane"), Unique, and Amanda, with Unique and Amanda in a separate office from Tashana and Diane. (*Id.* ¶ 28.) At that meeting, Tashana informed Artiles that the situation that started at the beginning of the year had been ongoing, and that the girls had been constantly following her

---

[2] Riback also recalled a meeting with Unique to address a name-calling incident between the same students, and that he and Artiles made clear that such behavior was inappropriate. (Dep. of Steven Riback ("Riback Dep.") 52:22-53:14.) Moreover, Riback indicated that because he viewed the confrontation as "name calling," he did not think it was appropriate to suspend any student. (*Id.* 53:5-7) ("[T]he name calling didn't seem like such a serious thing that I was going to suspend anybody.").)

around and taunting her.  (*Id.* ¶ 29.)  Once again, Artiles "basically [] listened" to Tashana at the meeting.  (Pl.'s Dep. 39:14-16; Defs.' 56.1 ¶ 30.)

In response to this second complaint, Artiles contacted the parents of Tashana and Diane to advise them of the situation.[3]  (Artiles Dep. 37:16-38:21.)  He also once again involved Riback, who was asked to notify Unique's family.  (Artiles Dep. 37:18-22; Riback Dep. 55:11-13.)  Both Artiles and Riback recall offering mediation to the students, which was declined.  (Artiles Dep. 37:18-22; Riback Dep. 54:17-22.)  Artiles and Riback then met with Tashana, Diane, Unique, and Amanda, and delivered the "simple message" to "[s]top calling each other names," and that their failure to do so would result in "consequences."  (Artiles Dep. 41:23-42:3; Riback Dep. 55:5-11.)[4]

The third and final formal discussion between Tashana and Artiles concerning her issues with the girls occurred on the last day of the school year in June 2006.  (Defs.' 56.1 ¶ 35; Pl.'s Dep. 44:21-45:13.)[5]  On that day, while Tashana and Diane were outside of the cafeteria during

---

[3] According to Artiles, in her second complaint, Tashana repeated that Unique and Amanda had engaged in more name-calling.  (Artiles Dep. 35:14-17.)

[4] At oral argument, the Court asked counsel for Plaintiffs what evidence there was to contradict the testimony of Artiles and Riback about their meetings with Unique and Amanda after two of the verbal encounters with Tashana.  Counsel responded that she could not recall at that time.  So, the Court subsequently invited counsel, via an Order, to provide such evidence.  In response, counsel submitted an affidavit reciting lengthy portions of Diane Robinson's deposition testimony, but this testimony did not relate to these first two meetings.  (*See* Supplemental Aff. of Mary E. Brady Marzolla ("Supplemental Marzolla Aff.") (Dkt. No. 47).)  Instead, it focused on a meeting at the very end of the school year, discussed below.  (*Id.*)  Thus, the Court concludes that there is no evidence contradicting the evidence that Artiles and Riback did, in fact, respond to Tashana's complaints regarding two incidents of verbal sparring between her and Unique and Amanda.

[5] Tashana claims that she had more informal conversations with Artiles throughout the school year about her ongoing problems with the girls.  (Pl.'s Dep. 45:6-9.)  Additionally, throughout the year there were about ten other incidents involving name-calling and arguing that

5

lunchtime, a friend of Tashana's told them that Unique and Amanda were planning to attack Tashana.  (Defs.' 56.1 ¶ 36; Pl.'s Dep. 40:10-14.)  Tashana, in order to avoid the situation, decided to go to her next class, in which she had a final exam that day.  (Defs.' 56.1 ¶ 38; Pl.'s Dep. 42:22-43:13.)  As Tashana was walking to her class, a large crowd was following behind her, but security guards arrived to control the situation, and she continued towards her classroom.  (Defs.' 56.1 ¶ 39; Pl.'s Dep. 43:3-9.)

School personnel, including Artiles and Riback, had independently found out about the plan to attack Tashana, and Artiles and Riback met with Diane at the close of the lunch period in Artiles's office.  (Pl.'s Dep. 41:9-22; Defs.' 56.1 ¶¶ 40-41.)  Diane explained to Artiles and Riback that she and Tashana had been informed about a plan to attack Tashana while they were outside of the cafeteria.  (Defs.' 56.1 ¶ 42; Robinson Dep. 41:10-14.)  Unique and Amanda were then summoned to the office, where they admitted that they were aware of a plan to attack Tashana, and that if that plan was not successful, then Tashana was going to be attacked at graduation.  (Defs.' 56.1 ¶ 43; Robinson Dep. 42:11-16, 44:15-45:7.)  Neither Unique nor Amanda revealed the identities of those who were actually going to participate in this attack. (Defs.' 56.1 ¶ 43.)  Artiles also had a meeting with Tashana after she finished her final exam, where she explained the circumstances of the plot to attack her as she understood them — specifically, that it was related to the issues she had been having with the girls since the

---

had to be broken up by school security, but that did not result in meetings with Artiles.  (Pl.'s Dep. 46:17-47:6, 48:7-14.)  Tashana's friend Diane testified that she had four formal meetings with Artiles and five or six informal discussions with Artiles throughout the course of the year about Tashana's issues with Unique, Brittney, and Amanda.  (Robinson Dep. 75:3-16.)  During at least some of the formal meetings between Diane and Artiles, Artiles indicated that he was going to talk to the girls, but did not mention any disciplinary action that would be taken against them.  (Id. 76:18-78:15.)

beginning of the school year, of which Artiles had already been informed.  (Defs.' 56 ¶ 45; Pl.'s

Dep. 44:11-17.)  Following that meeting, Artiles and Riback arranged for Tashana and Diane to

be personally escorted to their cars by security personnel.  (Defs.' 56.1 ¶ 44.)

 The NRHS graduation ceremony took place on the afternoon of Monday, June 26, 2006.

(Pl.'s Dep. 13:10-17.)  Following the conclusion of the ceremony, Tashana, Diane, and another

friend, Janella Ellis, began walking from the field, where the ceremony had been held, to the

main school building to obtain their diplomas.  (Defs.' 56.1 ¶ 60; Pl.'s Dep. 17:11-15, 54:17-

55:3.)  While Tashana was walking off the field, she saw Unique, Brittney, and Denise McCloud

("Denise") by a gate near the football field.  (Defs.' 56.1 ¶ 61.)  As Tashana was walking with

her friends, Unique shouted a profanity at Tashana.  (Id. ¶ 62.)  Tashana continued to walk, but

Unique, Brittney, and Denise followed her, yelling at her and taunting her.  (Id.; Pl.'s Dep.

20:22-25.)  Tashana gave them the middle finger, after which Denise spat on Tashana, and the

girls then started fighting.  (Defs.' 56.1 ¶¶ 64-65; Pl.'s Dep. 21:2-9, 53:22-54:4.)  During the

fight, Tashana was punched and kicked in the back and face, and at one point she fell to the

ground, where the girls continued to strike her.  (Defs.' 56.1 ¶ 66.)  Denise was also hit by

Tashana during the fight.  (Id. ¶ 67.)  The fight, which Tashana estimated lasted between one and

five minutes (Pl.'s Dep. 22:11-15), was broken up by a teacher at NRHS, Michael Siuta

("Siuta").  (Defs.' 56.1 ¶ 68.)[6]  Security guard Theresa Herska ("Herska") arrived on the scene

and held Tashana against a fence, trying to calm her down, while Unique, Brittney, and Denise

---

[6] Siuta's written statement after the fight stated: "While returning from the track I saw a group of students attack a graduate(s).  I was able to break up the fight by pulling a black girl, wearing a dark shirt with yellow piping, off of the NRHS graduate.  At that time a Hispanic boy wearing a red shirt and red baseball hat threatened to 'fuck you up — don't handle her like that.' After the fight was broken up they left — police and security followed shortly thereafter." (Decl. in Supp. of Defs.' Mot. for Summ. J. ("Silverman Decl.") Ex. Q.)

ran away.  (*Id.* ¶¶ 69-70.)[7]  The school resource officer arrived and escorted Tashana and her

sister to the school's parking lot, where Tashana called her father.  (*Id.* ¶ 71.)  Tashana's father

picked her up from that location and took her home, then accompanied Tashana to Nyack

Hospital, where she was treated for the injuries she sustained in the altercation.  (*Id.* ¶¶ 72-73.)

Tashana did not receive any further medical treatment following her visit to the hospital, nor did

she undergo any psychological treatment after the fight.  (*Id.* ¶ 74.)  However, Tashana testified

that she was very upset after the incident (Pl.'s Dep. 65:2-5), and that she still suffers from

emotional distress because of it, (*id.* 75:8-16).

After the graduation incident, the District suspended both Unique and Denise from

school.  (Defs.' 56.1 ¶ 75.)  Defendant Monahan, then the Deputy Superintendent of the District,

attended graduation and was informed about the altercation by Artiles and Siuta.  (*Id.* ¶ 76.)

Monahan first learned of the problems between Tashana and the girls who attacked her after the

incident at graduation, during a briefing session with Artiles, Riback, and the head principal of

NRHS, Mr. Hand.  (*Id.* ¶ 77; Artiles Dep. 89:25-90:25.)  Defendant Watkins, then the

Superintendent of the District, left for vacation immediately following graduation and did not

learn of the incident until he received papers commencing this lawsuit.  (*Id.* ¶ 78.)

NRHS had a policy of providing its students an Agenda, which contained the "Lessons

for Life" and the "Discipline Code," and which detailed the school's policies on conduct and

---

[7] There were about eight security aides assigned to work the June 2006 graduation, in addition to police officers and an on-site ambulance.  (Defs.' 56.1 ¶¶ 118-19.)  Prior to graduation, several meetings were held involving the principal, assistant principals, head of security, head of grounds, and the school resource officer (who is a police officer), and during which issues of safety were discussed.  (*Id.* ¶¶ 71, 120.)  There is no evidence that during the meetings there were any discussions about how to prohibit students who were barred from entering school property from attending the graduation, or about the possibility of Tashana being attacked.  (Pl.'s Resp. to Defs.' Local Rule 56.1 Statement of Facts ("Pl.'s 56.1") ¶ 120.)

discipline, as well as the rights and responsibilities of students, parents, and staff. (Defs.' 56.1 ¶ 93; Decl. in Supp. of Defs.' Mot. for Summ. J. ("Silverman Decl.") Ex. R.) Teachers were also given copies of these documents and encouraged to review them with their students to ensure that students understood the level of behavior that is expected from them. (Defs.' 56.1 ¶ 94.) The District's Code of Conduct also set forth certain rights and responsibilities, of both students and staff, that District teachers and staff were expected to enforce and that principals and superintendents were expected to promote. (*Id.* ¶¶ 95-96.) These policies prohibited, among other things, assault, fighting, and other forms of violence, as well as abusive or disrespectful language and harassing or intimidating others, each of which could result in a variety of disciplinary measures. (*Id.* ¶¶ 97-98; Silverman Decl. Exs. R, BB.)

For the 2005-2006 school year, the District also had in place a District Wide Safety Plan, which contained, among other things, anti-bullying measures to be implemented in District schools, as well as other mechanisms through which to minimize violent incidents. (Defs. 56.1 ¶¶ 99, 101-05; Silverman Decl. Ex. P, at 13-18.) Plaintiffs claim, however, that these "policies were merely a 'sham' and not enforced or followed." (Pl.'s Resp. to Defs.' Local Rule 56.1 Statement of Facts ("Pl.'s 56.1") ¶¶ 93-106.) Instead, according to Plaintiffs, "Defendants had a custom and practice of affirmatively concealing and failing to acknowledge, discipline or report known acts of violence." (*Id.*) Defendants provide concrete data, culled from records created by the District, on the number and type of suspensions handed out from the 2003-2004 school year through the 2005-2006 school year (Defs.' 56.1 ¶¶ 107-12), but Plaintiffs claim that this information is fundamentally flawed, given the system of reporting incidents and administering discipline that was in place at NRHS and that Artiles and Riback testified about in their depositions, (Pl.'s 56.1 ¶¶ 107-12).

Specifically, the District is required to provide violent and disruptive incident reports ("VADIRs") to the State Department of Education as part of the Basic Educational Data System ("BEDS") reporting process.  (Defs.' 56.1 ¶ 121; Aff. of Gregory J. Bayduss ("Bayduss Aff.") ¶ 5.)  Watkins, the Superintendent of the District during the 2005-2006 school year, and Monahan, who replaced him following Watkins's retirement on June 30, 2006, both certified the accuracy of the information contained within the VADIRs, and both conceded in their depositions that they did not personally review the VADIRs that they certified.  (*Id.* ¶¶ 14, 17, 125-129; Dep. of Dodge R. Watkins ("Watkins Dep.") 24:3-28:2; Dep. of Brian Monahan ("Monahan Dep.") 103:3-17.)

Plaintiffs have submitted a voluminous amount of incident reports detailing various infractions, many of which were violent, and some of which even had associated police reports, that indisputably demonstrate that the VADIR reports that were certified by Watkins and Monahan, from the 2003-2004 to 2005-2006 school years, were inaccurate in that they underreported the number of incidents that occurred at NRHS.  (Aff. of Mary E. Brady Marzolla ("Marzolla Aff.") Exs. C-E.)[8]  In fact, the NRHS security guards who were deposed, when asked to compare the security incident reports that they completed, agreed that many of the incidents that they reported were not reflected in the VADIRs.  (*See* Dep. of Barbara Rudolph ("Rudolph Dep."); Dep. of Theresa Herska ("Herska Dep."); Dep. of Robert Roland ("Roland Dep.").)  Riback and, after Riback retired, Artiles, were responsible for compiling the data to be included in the VADIRs.  (Defs.' 56.1 ¶¶ 132-33.)  Riback described this process, where the assistant

---

[8] For example, Monahan, who certified the 2005-2006 VADIR, essentially conceded that Tashana's assault should have been included in that VADIR.  (Monahan Dep. 82:8-85:22.)  Yet, the 2005-2006 VADIR reflected that "0" assaults without a weapon had taken place at NRHS during the 2005-2006 school year.  (Compl. Ex. A, at unnumbered page 17.)

principals maintain records of suspensions and other disciplinary actions taken throughout the school year, which records in turn are verified, collected, and used to assemble data for the VADIR. (*Id.* ¶¶ 134-36; Pl.'s 56.1 ¶ 135.) Riback himself kept an index card for each student, and would document any disciplinary actions he meted out on a student's card. Additionally, if a student was suspended, a letter was generated and kept on file, which allowed Riback's secretary to keep track of the suspensions given in Riback's grade and allowed the other assistant principals' secretaries to document and send Riback the number of suspensions that were handed out to the rest of the student body. (Riback Dep. 67:2-10.) In Riback's own words, the incident reports were already integrated into each grade principal's records and had no value in compiling data for the VADIR report because "the incident report doesn't suspend the student." (*Id.* 75:13-76:5.) Rather, "the VADIR reports were based on the actual disciplinary actions taken, which would be found in the files of the assistant principal." (Defs.' 56.1 ¶ 138.) As Plaintiffs point out, this would necessarily mean that a significant number of infractions and violent incidents that occurred at NRHS — evidence of which is detailed in the incident reports contained in several exhibits to Plaintiffs' counsel's affidavit — did not result in any disciplinary action, as reflected in the low numbers reported in the VADIRs. (Pl.'s 56.1 ¶¶ 107-12.) Defendants, for their part, maintain that the District has never been investigated by the State Department of Education for violations stemming from their VADIR procedures (Defs.' 56.1 ¶ 139), and they have provided a substantial number of disciplinary reports reflecting the extent to which students were actually disciplined by NRHS administrators during the years in question, (Supplemental Decl. in Supp. of Defs.' Mot. for Summ. J. ("Supplemental Decl.") Ex. DD).

11

B. Procedural History

Plaintiffs filed the Complaint on September 19, 2007 (Dkt. No. 1), and Defendants answered on November 13, 2007, (Dkt. No. 10).  On October 1, 2010, Defendants filed their motion for summary judgment.  (Dkt. No. 31.)  The Court held oral argument on July 20, 2011.

II. Discussion

A. Standard of Review

Summary judgment may be granted where it is shown "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (same).  "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Dall. Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003); *see also Tufariello v. Long Island R.R. Co.*, 458 F.3d 80, 85 (2d Cir. 2006) (noting that a court must draw all reasonable inferences in the nonmovant's favor).

A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists.  *See Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.*, 432 F.3d 428, 433 (2d Cir. 2005).  "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim.  In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (internal citations omitted).  "When the moving party has carried its burden under Rule 56[(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (footnote omitted); *see also McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment.").  "A fact is 'material' when it might affect the outcome of the suit under governing law." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted).  At summary judgment, a court is not charged with weighing the evidence and determining its truth, but with determining whether there is a genuine issue for trial.  *See Westinghouse Elec. Corp. v. N.Y.C. Transit Auth.*, 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990).  A court's goal should be "to isolate and dispose of factually unsupported claims." *Celotex*, 477 U.S. at 323-24.

B.  Analysis

1. Liability for Violation of the Substantive Due Process Right to Bodily Integrity

Plaintiffs' theory of liability for all Defendants hinges on a violation of Tashana's substantive due process right to bodily integrity, a right recognized by the courts.  *See Lombardi v. Whitman*, 485 F.3d 73, 78-79 (2d Cir. 2007) ("The substantive component of due process encompasses, among other things, an individual's right to bodily integrity free from unjustifiable government interference."); *Pabon v. Wright*, 459 F.3d 241, 253 (2d Cir. 2006) (noting that the Fourteenth Amendment protects an individual's interest in bodily integrity); *accord Ingraham v. Wright*, 430 U.S. 651, 673 (1977) (noting that among the liberties protected by the Due Process Clause of the Fourteenth Amendment is "a right to be free from . . . unjustified intrusions on personal security"); *Wragg v. Thornton*, 604 F.3d 464, 467 (7th Cir. 2010) (recognizing a substantive due process right not to be physically harmed by a government official); *Haberthur v. City of Raymore*, 119 F.3d 720, 723-24 (8th Cir. 1997) (holding that plaintiff had adequately alleged that police officer's sexual assault violated her substantive due process right to bodily

integrity); *Jones v. Wellham*, 104 F.3d 620, 628 (4th Cir. 1997) (holding that a woman's rape claim against a police officer was not a Fourth Amendment claim, but an alleged violation of her "substantive due process right under the Fourteenth Amendment not to be subjected by anyone acting under the color of state law to the wanton infliction of physical harm"); *Doe v. Taylor Ind. Sch. Dist.*, 15 F.3d 443, 450-52 (5th Cir. 1994) (holding that sexual abuse of a student by a teacher violated the student's constitutional right to bodily integrity).[9]

The Second Circuit has emphasized that "[o]nly an affirmative act can amount to a violation of substantive due process, because Due Process is phrased as a limitation of the State's power to act, not as a guarantee of certain minimal levels of safety and security." *Lombardi*, 485 F.3d at 79 (internal quotation marks omitted). Moreover, state action resulting in bodily harm is not a substantive due process violation unless the state "action was so 'egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Pena v. DePrisco*, 432 F.3d 98, 112 (2d Cir. 2005) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)). Thus, it is insufficient to allege that a state actor failed to protect an individual, even from a known danger of bodily harm or failed to warn that individual of such danger. *See Collins v. City of Harker Heights*, 503 U.S. 115, 125-29 (1992) (holding that there was no due process violation where plaintiff alleged that the city failed to properly train or warn its employees of known dangers that resulted in sanitation worker's asphyxiation). This includes

---

[9] In their Memorandum of Law opposing Defendants' motion, Plaintiffs also asserted that Defendants violated Tashana's due process right to an education. (Pls.' Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. Pursuant to Fed. R. Civ. P. 56 ("Pls.' Mem.") 3.) This claim, brought under the Fourteenth Amendment, was based on the premise that state law provided Tashana with a property interest in her education, and that the graduation incident somehow denied her of that interest. (*Id.*) This claim was abandoned at oral argument by Plaintiffs' counsel.

dangers arising from private parties.  As the Supreme Court explained in *DeShaney v.*

*Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989), the purpose of the Due Process

Clause of the Fourteenth Amendment "was to protect the people from the State, not to ensure

that the State protected them from each other."  This does not leave those who suffer at the hands

of private parties without recourse.  "The Framers were content to leave the extent of

government obligation in the latter area to the democratic political process."  *Id.*

However, "in exceptional circumstances a governmental entity may have a constitutional

obligation to provide . . . protection, either because of a special relationship with an individual,

or because the governmental entity itself has created or increased the danger to the individual."

*Ying Jing Gan v. City of New York*, 996 F.2d 522, 533 (2d Cir. 1993) (citing *DeShaney*, 489 U.S.

at 198).  Here, Plaintiffs allege no "special relationship" between themselves and the government

officials, and confirmed this at oral argument.[10]  Instead, Plaintiffs contend that Defendants are

_____

[10] "Special relationships ordinarily arise if a government actor has assumed an obligation
to protect an individual by restricting the individual's freedom in some manner, as by
imprisonment."  *Lombardi*, 485 F.3d at 80 n.3.  The consensus among the courts is that the
"special relationship" doctrine does not apply to the school setting.  *See, e.g.*, *Hasenfus v.
LaJeunesse*, 175 F.3d 68, 71-72 (1st Cir. 1999) (declining to find existence of special
relationship in the school context); *Wyke v. Polk Cnty. Sch. Bd.*, 129 F.3d 560, 569 (11th Cir.
1997) (explicitly rejecting notion that compulsory school attendance laws create a special
relationship); *Doe v. Hillsboro Indep. Sch. Dist.*, 113 F.3d 1412, 1415 (5th Cir. 1997) (holding
that compulsory school attendance laws do not create a special relationship); *Dorothy J. v. Little
Rock Sch. Dist.*, 7 F.3d 729, 732 (8th Cir. 1993) (holding that a special relationship does not
arise out of state-mandated school attendance); *Maldonado v. Josey*, 975 F.2d 727, 730-31 (10th
Cir. 1992) (holding that no affirmative duty requires the state to protect school children merely
because of compulsory attendance laws); *D.R. v. Middle Bucks Area Vocational Technical Sch.*,
972 F.2d 1364, 1370-71 (3d Cir. 1992) (no special relationship between school and its students);
*DiStiso v. Town of Wolcott*, 750 F. Supp. 2d 425, 446 (D. Conn. 2010) ("Although the Second
Circuit has not directly addressed the issue, district courts in this Circuit have repeatedly held
that compulsory education law . . . does not restrict a child's freedom so as to place him in
state custody or control within the meaning of the [special relationship] exception."); *but see*
Deborah Austern Colson, Note, *Safe Enough to Learn: Placing an Affirmative Duty of
Protection on Public Schools Under 42 U.S. Section 1983*, 30 Harv. C.R.-C.L. Rev. 169 (1995)

culpable under the state created danger exception to *DeShaney*.  Under this form of liability, when a "government official takes an affirmative act that creates an opportunity for a third party to harm a victim (or increases the risk of such harm), the government official can potentially be liable for damages."  *Lombardi*, 485 F.3d at 80.  In the cases where the Second Circuit has found a state created danger, "a third party's criminal behavior harmed the plaintiff after a government actor — always a law enforcement officer — enhanced or created the opportunity for the criminal act through some interaction or relationship with the wrongdoer."  *Id.*  Put another way, the "special relationship" exception arises from "the relationship between the state and a particular victim, whereas the 'state created danger' liability arises from the relationship between the state and the private assailant."  *Pena*, 432 F.3d at 109.

The early incantations of state created danger involved law enforcement officers encouraging the private actors to inflict harm upon others.  In the wake of *DeShaney*, the Second Circuit first recognized the notion of a "state created danger" in *Dwares v. City of New York*, 985 F.2d 94 (2d Cir. 1993), *overruled on other grounds by Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993).  In *Dwares*, the plaintiff alleged that police officers conspired with "skinheads" to assault a group of flag-burners expected to be at a public protest.  In particular, the plaintiff claimed that the police officers who were present when these "skinheads" attacked plaintiff while he attended the demonstration (and supported those who burned flags) had previously communicated to the "skinheads" that the police would not interfere with, or arrest, the "skinheads" for assaulting any flag-burners, "unless they got completely out of control."  *Id.* at 96-97.  According to the *Dwares* court, such "a prearranged

_____

(advocating for application of special relationship doctrine in schools).

official sanction of privately inflicted injury would surely have violated the victim's rights under the Due Process Clause." *Id.* at 99.

The next application of the state created danger exception was in *Hemphill v. Schott*, 141 F.3d 412 (2d Cir. 1998). Describing "state created danger" liability as arising when a "state actor aids and abets a private party in subjecting a citizen to unwarranted physical harm," *id.* at 418, the *Hemphill* court found such liability where the police not only returned a firearm to a robbery victim, but then drove him to the scene of the robber's arrest, whereupon the robbery victim shot the robber. *Id.* at 418-20. The following year, in *Snider v. Dylag*, 188 F.3d 51, 55 (2d Cir. 1999), the Second Circuit held that a prison guard who told inmates that it was "open season" on a prisoner, created a danger where inmates later beat up that prisoner.

The reach of state created liability was extended in *Pena v. DePrisco*, 432 F.3d 98 (2d Circ. 2005). In *Pena*, family members of pedestrians who were killed by an intoxicated off-duty police officer brought a § 1983 action against other officers, claiming that they sanctioned the intoxicated officer's alcohol abuse and driving under the influence, in violation of the pedestrians' substantive due process rights. In analyzing plaintiffs' theory of liability, the *Pena* court broke down the categories of officers into those who merely "failed to intercede on the day of the accident," and those who encouraged, even if implicitly, the intoxicated officer to drink excessively and drive. *Id.* at 110-11. In making this distinction, the court recognized that in applying the "state created danger" doctrine, the Second Circuit has "sought to tread a fine line between conduct that is 'passive' as in *DeShaney* and that which is 'affirmative' as in *Dwares*," *id.* at 109, an exercise that the court acknowledged can be "difficult," *id.* at 110. Nonetheless, the court had little trouble in holding that plaintiffs' allegations regarding officers who either failed to intercede, or otherwise "stood by and did nothing" to address the intoxicated officer's

17

previous misconduct were "inadequate to state a substantive due process claim." *Id.* at 110.  As the court emphasized: "A failure to interfere when misconduct takes place, and no more, is not sufficient to amount to a state *created* danger."  *Id.* (emphasis in original).

However, the court found sufficient plaintiffs' allegations regarding the other officers who communicated, even if only implicitly, that the intoxicated officer would not be "arrested, punished, or otherwise interfered with while engaging in misconduct that is likely to endanger the life, liberty or property of others."  *Id.* at 111.  These allegations included, for example, assertions that some of the defendants drank with the offending officer and that one defendant asked the intoxicated officer for a ride back to the precinct house.  *Id.*  Based on these allegations, the court emphasized that "the type of claim [plaintiffs' asserted] [was] based on more than a failure to prevent misbehavior and to reprimand or punish the miscreants."  *Id.* at 112.  It was based on the assertion "that prior assurances of impunity were actually, albeit implicitly, communicated" to the miscreants.  *Id.*  In reaching this conclusion, however, the court acknowledged that *Dwares*, which involved explicit governmental approval of misconduct, had not considered the viability of claims of "repeated inaction on the part of government officials over a long period of time without an explicit statement of approval," and, in particular, whether such claims of "implicit prior assurances" might rise "to the level of an affirmative act."  *Id.* at 115.  As such, the rule announced in *Pena* was deemed not to be "clearly established" by *Dwares*, or, therefore, at the time of defendants' alleged actions.  Thus, the claims against the officers were dismissed on qualified immunity grounds.  *Id.* ("The rule of law that we draw from *Dwares* today was not 'clearly established' at the time of the conduct in question here.  We therefore conclude that the pre-accident individual defendants are entitled to qualified immunity as to the substantive due process claims." (footnote omitted)).

18

Plaintiffs appear to recognize that mere inaction on the part of the individual Defendants to prevent any harm to Tashana by itself would not get their due process claim past *DeShaney*. Rather, Plaintiffs assert that Defendants' alleged failure to intercede created, or at least increased the risk of, danger to Tashana. According to Plaintiffs, Defendants' actionable inaction took two forms. One involved Artiles' alleged failure to sufficiently punish or confront Tashana's assailants, despite complaints about them regarding their misbehavior and their interactions with Tashana. (Pls.' Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. Pursuant to Fed. R. Civ. P. 56 ("Pls.' Mem.") 2-4.) The other involved the alleged conduct of all the individual Defendants to under-report incidents of violent or disruptive behavior by students at NRHS. (*Id.* at 6-8.) Neither asserted failure by Defendants, however, supports Plaintiffs' assertion of a state created danger.

In terms of the graduation incident, there are several undisputed, but important facts that received little attention in the Parties' briefing of this motion. First, the set of students with whom Tashana fought at graduation (Unique, Brittney, and Denise) was not the same set of students with whom she first had the verbal back-and-forth at the beginning of the school year (Unique, Brittney, and Amanda), or with whom she verbally sparred later in the school year. Second, prior to the graduation incident, there were no violent clashes between Tashana and any of those involved in the graduation incident. (Robinson Dep. 47:6-14.) There is, to be sure, evidence that Tashana felt that Unique in particular had threatened her (Pls.' Dep. 30:7-12, 34:14-22, 35:12-15), but even Tashana does not allege that they ever fought, (Defs.' 56.1 ¶ 82). Rather, the first and only act of violence occurred on graduation day. Third, Tashana has offered no evidence that she ever complained to Artiles about Denise before the graduation day incident, and her deposition testimony is that she only complained about Brittney after the first verbal

19

encounter at the beginning of the school year.  (Pl.'s Dep. 30:4-32:18 (describing the initial

incident involving Unique, Brittney, and Amanda); *id.* 34:14-37:2 (describing the second, mid-

year verbal altercation involving only Unique and Amanda and making no mention of Brittney);

*id.* 40:3-17, 43:15-24 (discussing the incident that occurred on the last day of school, which

involved "Amanda, Unique," "[a]nd the friends that they hang with, I guess," and which only

Unique and Amanda were questioned about).)[11]  Fourth, as noted *supra* in note 1, there is

undisputed evidence that Unique, Brittney, and Denise all had, in fact, been disciplined by the

District before the graduation incident.  Unique had been suspended for cutting detentions and

talking to a teacher in a threatening tone (Defs.' 56.1 ¶ 83); Brittney had been suspended for

fighting with another student, had been disciplined for other misconduct, and withdrew from

school before the graduation incident (*id.* ¶¶ 84-86); and Denise was a student at a different

school within the District, who had been suspended for fighting, barred from school grounds,

and had not been seen by Tashana (even if seen by others) at NRHS before graduation, (*id.* ¶¶

87-88).[12]

---

[11] In fact, it appears that by the last day of the 2005-2006 school year, Brittney had
withdrawn from school.  (Defs.' 56.1 ¶ 84; Robinson Dep. 81:13-83:5.)

[12] This undisputed evidence dulls the edge of Plaintiffs' rhetorically sharp assertion that
"Defendants gave the perpetrators free, unrestricted reign on school grounds in spite of actual
knowledge of their vicious propensities and specific threat against Tashana and let them loose
upon Tashana daily at school and later at graduation."  (Pls.' Mem. 6.)
    Further, as to Denise, although Plaintiffs cite Diane's deposition testimony in support of
the notion that Tashana and Diane had seen Denise on school grounds in the spring of 2006,
prior to graduation (Pls.' 56.1 ¶ 87), Diane's testimony on this point is unhelpful.  Diane
continuously refers to a "Dee-Dee" with whom she was familiar, who attended NRHS, and who
was friends with Unique and Amanda and was involved in the ongoing conflict with Tashana
during the 2005-2006 school year.  (Robinson Dep. 11:14-25.)  In her testimony about the
graduation incident, Diane described the actions of Dee-Dee's sister — whose name she believed
was Denise but whom she did not recognize at the time — which included spitting at Tashana.

In addition to these unfavorable facts, Plaintiffs' theory of state created danger also is fatally undermined by the absence of any evidence that Artiles, even by his alleged inaction in response to a handful of complaints by or on behalf of Tashana, affirmatively communicated, even implicitly, to the graduation-day assailants that violent behavior would be tolerated.  Of course, the Court accepts as true Tashana's claims that she went to Artiles on several occasions to complain about Unique (and even assumes she might have complained about the others) and that Artiles did not discipline Unique or any of the graduation day assailants in response to Tashana's complaints.  What is missing from Plaintiffs' case, however, is any evidence that Artiles, by his alleged non-responsiveness, *communicated*, even implicitly, to Unique, Brittney, and Denise that it was acceptable for them to pick a fight with Tashana.  This communication gap is a critical missing link between the danger Tashana claims she faced and the state's responsibility for creating it.  As Judge Pooler has explained, "[t]he affirmative conduct of a

---

(*Id.* 56:17-57:23.)  However, when Plaintiffs' counsel later asked Diane if Dee-Dee was the same person as Denise, Diane replied that Dee-Dee and Denise were in fact the same person, and she then identified Dee-Dee's sister as Brittney, contradicting her earlier testimony.  (*Id.* 81:25-82:5.)  Diane went on to state that she had seen this new "Dee-Dee" on school grounds in the spring of 2006, and it is this testimony that Plaintiffs latch onto in support of the notion that Tashana and Diane had encountered Denise prior to graduation.  However, it is clear that Diane had confused Denise and Brittney (the real Dee-Dee), and that she was not referring to Denise when she was discussing the student who she had seen on school grounds during the year.  (*See* Robinson Dep. 58:15-16 ("I get confused because I think their both name [sic] start with a D.  I know Dee-Dee's name.").)  That Brittney is Dee-Dee, and not Denise, is substantiated by the fact that Brittney withdrew from NRHS some time in June 2006 (Defs.' 56.1 ¶ 84), and that Diane testified that she had been informed that Dee-Dee had been expelled towards the end of the school year and that she was surprised to see her at graduation, (Robinson Dep. 68:22-25, 82:6-83:5).  Finally, logic and common sense dictate that neither Tashana nor Diane had seen or met Denise prior to graduation, as it is undisputed that one of the sisters was completely unfamiliar to Diane (*see id.* 56:17-19 ("Then [Dee-Dee's] sister, who we never ever seen throughout the whole year, she started cursing and talking to Tashana and she spit at Tashana."), and it is undisputed that Brittney had been involved in at least one prior in-school altercation with Tashana, and Denise, who attended a different school, was the assailant who spit at Tashana on the day of graduation, (Defs.' 56.1 ¶¶ 20, 65, 87).

government official may give rise to an actionable due process violation if it communicates, explicitly or implicitly, official sanction of private violence."  *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 429 (2d Cir. 2009) (discussing the state created danger doctrine in a case where police officers were alleged to have implicitly encouraged the perpetration of domestic abuse); *see also Pena*, 432 F.3d at 111 ("When . . . state officials communicate to a private person that he or she will not be arrested, punished, or otherwise interfered with while engaging in misconduct that is likely to endanger the life, liberty or property of others, those officials can be held liable under section 1983 for injury caused by the misconduct under *Dwares.*").

The undisputed evidence is that Plaintiff only complained about Brittney once before the last day of school, and never complained about Denise, who did not even attend the same school, before the graduation incident.  And, even though Tashana claims that she complained to Artiles on numerous occasions about Unique before the last day of school, there is no evidence that Unique was aware of any more than two of these complaints.  In fact, Unique knew about two of Tashana's complaints because Artiles, through Riback, addressed them with Unique.  The first complaint involved the verbal incident toward the beginning of the school year, which was met with a rebuke from Artiles and Riback.  (Artiles Dep. 34:6-11; Riback Dep. 52:24-53:14.)[13]  The second complaint, which followed a verbal encounter between Tashana and Unique, also resulted in a meeting between Riback and Unique, at the request of Artiles.  (Artiles Dep. 35:18-22, 37:16-39:3.)  In Artiles's and Riback's judgment, the episodes between Tashana and Unique

---

[13] It bears repeating that Tashana herself engaged in name-calling during this first episode.

involved "name calling" and did not merit a suspension.[14]  (Riback Dep. 53:5-9, 55:5-13.)  In

fact, according to Artiles, Unique also was told that if she failed to stop the name-calling, there

would be "consequences."  (Artiles Dep. 41:23-42:6.)

    From this evidence, Plaintiffs do not have a viable claim that Artiles (or any other senior

school official), by any sort of inaction, communicated anything to Unique, Brittney, or Denise

suggesting that they could physically attack Tashana with impunity.  Taking the evidence in a

light most favorable to Plaintiffs, the most that can be said is that Artiles took insufficiently

severe action in reprimanding Unique and Brittney for the two *verbal* confrontations Tashana

reported to Artiles.  And, even if Artiles (or any other school official) did nothing in response to

any other complaints made by Tashana (or by others on her behalf), such inaction might be

actionable only if Unique knew of Artiles's non-response to the complaints and it could be said

that she inferred from such inaction a green light to escalate things with Tashana.  However,

Plaintiffs offer no evidence to support the notion that Unique was aware of these other

complaints, or that Artiles somehow otherwise signaled to Unique (and the others) that it was

open season on Tashana, or more to the point, that Artiles would tolerate Unique and the others

transforming their behavior from verbally taunting Tashana to physically harming her.

    Similarly unpersuasive is Plaintiffs' claim about the inaccurate VADIR reports.  These

reports contain data about disruptive and violent incidents by students at the reporting school.

(Defs.' 56.1 ¶ 121.)  In other words, they reflect historical information about what qualifying

---

[14] This view was shared by Amanda Gunning, the teacher who spoke to Artiles on
Tashana's behalf after the second incident between Tashana and Unique.  According to Ms.
Gunning, while Tashana was upset by the one incident, Ms. Gunning felt that the tension
between Tashana and Unique was "nothing that seemed terribly out of the realm of normal
school girl kind of conflicts."  (Gunning Dep. 24:17-18.)

events occurred during a particular school year.  Their accuracy is no doubt important to state

education officials, but Plaintiffs have failed to explain how their inaccuracy somehow qualifies

as a state created danger that subjects Defendants to liability for the graduation incident.  There

is no evidence remotely linking these inaccurate reports to the decision of Unique and the others

to wait until graduation to physically confront Tashana.  For example, Unique is not alleged to

have been aware of these reports, such that their inaccuracy would somehow have encouraged

her to assault Tashana on the theory that the attack would go unreported to state officials.  Nor

does the mere inaccuracy of the reports in any way show that Defendants tolerated violent

behavior by Unique or any other student.  Instead, it merely allows for the possibility that

Defendants did not want state officials to be informed of the extent of disruptive and violent

conduct in the District.[15]

Given this factual landscape, this case is far different from others found by the Second

Circuit to fit within the narrow class of cases where governmental conduct is found to be a state

created danger.  There obviously is nothing akin to the explicit encouragement of the skinheads

alleged in *Dwares*.  There also is nothing similar to the direct contact between the law

---

[15] Plaintiffs' reliance on *Gremo v. Karlin*, 363 F. Supp. 2d 771 (E.D. Pa. 2005) is misplaced.  In *Gremo*, the court found that plaintiff had successfully established a deprivation of his due process right to bodily integrity through allegations that he had been assaulted by a group of students who had attacked other students over a two-year period, and that the school district covered up a two-year escalation of violence by the same group of students.  *Gremo*, 363 F. Supp. 2d at 782-90.  Here, there is no comparable evidence that Unique or the others who were involved in the graduation day incident had any such history, either with Tashana or other students.  Again, the evidence in this case indisputably demonstrates that there had been no physical attacks on Tashana by Unique and the others before graduation.  Thus, no reasonable jury could conclude that the supposed practice of the District in this case to submit inaccurate VADIR reports created the danger that Tashana would be attacked by Unique.  *See Moore v. Dall. Indep. Sch. Dist.*, 557 F. Supp. 2d 755, 768 (N.D. Tex. 2008) (holding that failure to report accurate student violence statistics "could not have increased the risk of harm to [plaintiff]").

enforcement officials and the miscreants in *Pena* and *Okin*, where the "repeated, sustained inaction" by the governmental officials implicitly communicated to the wrong-doers that there would be no consequences suffered from their obvious and violent misdeeds.  *Okin*, 577 F.3d at 428.  Neither Artiles nor any other school official did anything to mock or make light of Tashana's concerns in the presence of Unique or the others, *compare Okin*, 577 F.3d at 421-22, nor did any school official repeatedly convey to Unique and the others that they would tolerate Unique and the others physically assaulting Tashana.  Admittedly, "'the boundaries of the state created danger exception to *DeShaney* are not entirely clear,' but the exception does require a government defendant to 'either be a substantial cause of the danger . . . or at least enhance it in a material way.'"  *Scruggs v. Meriden Bd. of Educ.*, No. 03-CV-2224, 2007 WL 2318851, at *12 (D. Conn. Aug. 10, 2007) (quoting *Clarke v. Sweeney*, 312 F. Supp. 2d 277, 293 (D.Conn.2004)).  Here, Plaintiffs fall far short of substantiating that Defendants' action, or lack of action, substantially caused or enhanced the danger to Tashana.  At worst, their actions were insufficient to prevent the danger, thus placing this case squarely in the ambit of *DeShaney*.  *See id.* ("Although the record here clearly reflects that Daniel was subjected to repeated bullying and harassment by his classmates and that Defendants were made aware of this harassment, Defendants' mere failure to take steps to fully remedy the situation does not amount to an affirmative creation of danger to Daniel's well-being.").

Relatedly, the undisputed evidence undercuts any viable claim that Defendants' conduct shocked the conscience.  As noted, to establish a violation of their substantive due process rights, in addition to the elements described above regarding state created danger, Plaintiffs must demonstrate that Defendants' actions were "so egregious, so outrageous, that [they] may fairly be said to shock the contemporary conscience."  *Lewis*, 523 U.S. at 847 n.8; *see also Matican v.*

25

*City of New York*, 524 F.3d 151, 158 (2d Cir. 2008).  In *Lewis*, the Supreme Court noted that

intentionally inflicted injuries are the "most likely to rise to the conscience-shocking level."  523

U.S. at 849.  On the other end of the spectrum, the Supreme Court has emphasized that

"negligently inflicted harm is categorically beneath the threshold of constitutional due process."

*Id.*; *see also Okin*, 577 F.3d at 431 (distinguishing between intentionally inflicted harms, which

are likely to rise to conscience shocking level, and negligently inflicted harms, which cannot

constitute conscience-shocking behavior).  In between these poles, the Supreme Court has held

"that harm inflicted recklessly or with deliberate indifference does not shock the conscience in

the context of a time sensitive emergency such as a high-speed chase."  *Matican*, 524 F.3d at 158

(citing *Lewis*, 523 U.S. at 853-54).  However, even in the context of deliberative decision-

making, the Second Circuit has recognized that where state actors have been subject "to the pull

of competing obligations," *Lombardi*, 485 F.3d at 83 (internal quotation marks omitted), the

courts should be reluctant to impose "broad constitutional liability for the government officials,

whose decisionmaking might be inhibited by the threat of lawsuits," *Matican*, 524 F.3d at 159

(citing *Lombardi*, 485 F.3d at 84).  But where "the alleged behavior of . . . defendants [took

place] over an extended period of time and in the face of action that presented an obvious risk of

severe consequences and extreme danger," the Second Circuit has found that official inaction

can shock the conscience.  *Pena*, 432 F.3d at 114; *see also Okin*, 577 F.3d at 431-32 (finding that

plaintiffs' allegations of officers' repeated failure to address obvious domestic abuse created

triable issue about officers' deliberate indifference and their conscience-shocking behavior).

  For Plaintiffs to demonstrate conscience-shocking behavior in this case, they must

establish at least a plausible claim that Defendants were repeatedly and deliberately indifferent to

an obvious threat of violence to Tashana.  In particular, Plaintiffs require some basis to establish

that Defendants' response to the *verbal* encounters between Tashana were actionable because they reflected their deliberate indifference to the *violent* encounter that later took place at the graduation incident.  This is so because the undisputed evidence is that Defendants did not completely ignore Tashana's complaints regarding the verbal encounters she had with Unique. As discussed in detail above, Artiles and Riback on two separate occasions met with Unique and explained that the verbal taunts were inappropriate.  Nor did the District ignore other misconduct by Unique and the other students, as they had been severely disciplined for their behavior involving other individuals.  And, Artiles and Riback investigated the rumors of an attack on Tashana on the last day of school, even going so far as to summon Unique and Amanda to a meeting, and later providing Tashana and Diane an escort to their cars that day.

While Plaintiffs might, in hindsight, believe that Defendants should have more severely punished those involved in the trash-talking encounters, the fact that the graduation incident ultimately occurred does not demonstrate that Defendants were deliberately indifferent to Tashana's right to bodily integrity.  *See Scruggs*, 2007 WL 2318851, at *13 ("In retrospect, given the evidence presented and the subsequent tragic turn of events, the record reflects poorly on Defendants' decision to relatively limit their response to the repeated bullying of [Plaintiff] by his classmates; nevertheless, Defendants' failure to fully remedy the bullying situation does not amount to 'brutal' or 'oppressive' treatment of [Plaintiff] at school."); *cf. Yap v. Oceanside Union Free Sch. Dist.*, 303 F. Supp. 2d 284, 294-95 (E.D.N.Y. 2004) (in case involving allegation of deliberate indifference to discriminatory harassment, noting that deliberate indifference "requires something more than a proffer indicating the ultimate inadequacy of preventative and curative measures").  Again, until graduation, there had been no violence between Tashana and Unique (or the others), and Plaintiffs have failed to cite any legal authority

27

that required Artiles to suspend or otherwise punish Unique and the others for their verbal

volleys at Tashana, even if some involved threatening comments.  *See C.V. v. Bd. of Educ.*, 727

F. Supp. 2d 657, 673 (S.D. Ohio 2010) ("Plaintiffs have pointed to no cases in which a court has

held that a student's substantive due process rights were violated when the student was subjected

to verbal taunting by classmates, and the Court has not been able to find any."); *Morgan v. Bend-*

*La Pine Sch. Dist.*, No. 07-CV-173, 2009 WL 312423, at *10 (D. Or. Feb. 6, 2009) (noting the

absence of any Ninth Circuit authority allowing a substantive due process claim "premised on a

violation of the right to bodily integrity arising out of the failure of teachers or a school district

to detect and prevent student-to-student sexual harassment in a public school"); *Risica ex rel.*

*Risica v. Dumas*, 466 F. Supp. 2d 434, 440 (D. Conn. 2006) ("The school was under no

constitutional duty to prevent the student-on-student harassment" that allegedly included

"bullying").  Indeed, reflexively suspending students who are involved in verbal misconduct

might result in liability for school officials.  *See Killion v. Franklin Reg'l Sch. Dist.*, 136 F.

Supp. 2d 446, 451 (W.D. Pa. 2001) (holding that suspension violated due process clause because

school failed to provide written notice and basis for suspension).

   As the Supreme Court has observed, "[s]chool principals have a difficult job."  *Morse v.*

*Frederick*, 551 U.S. 393, 409 (2007).  Here, Artiles's judgment was that Tashana and the other

students had been engaged in a verbal back-and-forth that required nothing more than the

meetings that were held with Tashana and Unique.  That subsequent events arguably proved him

wrong does not establish that he was deliberately indifferent to Tashana's right to bodily

integrity, and therefore his decision not to do more to confront Unique and the others falls far

short of shocking the conscience.  *See Pietrangelo v. Alvas Corp.*, 664 F. Supp. 2d 420, 434 (D.

Vt. 2009) (granting summary judgment where police officer left the scene of incident after

allegedly hearing threatening statement made to plaintiff by third party, because police officer's judgment was that there was no actual threat to plaintiff); *Risica*, 466 F. Supp. 2d at 440 (concluding that principal's decision merely to talk to student who was verbally "bullying" plaintiff did not qualify as deliberate indifference and, therefore, did not "shock the contemporary conscience"); *Scruggs*, 2007 WL 2318851, at *13 ("Although the efficacy of Defendants' conduct [to address repeated bullying of plaintiff] may be questioned, the level of their response to [plaintiff's] being bullied was not so extreme or outrageous as to violate his substantive due process rights . . . ."). Therefore, Plaintiffs have failed to demonstrate that the individual Defendants violated Tashana's constitutional right to bodily integrity, and the Court grants Defendants' motion for summary judgment on this ground.[16]

---

[16] Because the Court concludes that the individual Defendants did not violate Tashana's right to bodily integrity, it need not and does not address Defendants' claim that Plaintiffs have failed to establish *Monell* liability. *See Kelsey v. Cnty. of Schoharie*, 567 F.3d 54, 65 (2d Cir. 2009) (dismissing, without discussion, plaintiffs' municipal liability claim, where plaintiffs failed to establish any underlying constitutional violation); *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct."). For the same reason, the Court grants Defendants' motion as to Lawrence Chambers, as his loss of services claim depends on Tashana's § 1983 claim. *Cf. Nealy v. U.S. Surgical Corp.*, 587 F. Supp. 2d 579, 586 (S.D.N.Y. 2008) ("Under New York law . . . a claim for loss of . . . services or support is derivative of the related primary causes of action; dismissal of the primary claims requires the Court to dismiss any dependent derivative claims.").

In any event, the Court concurs with the view of most courts that have rejected derivative § 1983 claims of the kind asserted by Lawrence Chambers here. *See Johnson v. City of New York*, No. 07-CV-1991, 2008 WL 2971772, at *1 n.1 (S.D.N.Y. July 25, 2008) ("It is doubtful that . . . a claim [for loss of services under § 1983] would state a claim for relief."); *Harrison v. Harlem Hosp.*, No. 05-CV-8271, 2007 WL 2822231, at *4 (S.D.N.Y. Sept. 28, 2007) (noting that "[w]hile the Second Circuit has not addressed whether a plaintiff may bring a loss of consortium claim pursuant to federal civil rights statutes, the weight of authority holds that they may not," and citing cases); *Zamora v. N. Salem Cent. Sch. Dist.*, 414 F. Supp. 2d 418, 427 (S.D.N.Y. 2006) (holding that derivative damages were unavailable under § 1983); *but see Damato v. City of New York*, No. 06-CV-3030, 2008 WL 2019122, at *4 (S.D.N.Y. May 12, 2008) (denying summary judgment on derivative loss of services claim where summary judgment was also denied on false arrest and malicious prosecution claims, which were based on

2. Qualified Immunity

The individual Defendants also seek summary judgment on qualified immunity grounds. In deciding whether to grant a government official's motion for summary judgment on qualified immunity grounds, a court conducts a two-part inquiry.  The court may ask whether "the facts, viewed in the light most favorable to the plaintiff, show that the [official's] conduct violated a constitutional right." *Gilles v. Repicky*, 511 F.3d 239, 244 (2d Cir. 2007) (quoting *Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007)); *see also Saucier v. Katz*, 533 U.S. 194, 201 (2001), *abrogated on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009).  Even "if the plaintiff has satisfied th[at part], the court must decide whether the right at issue was 'clearly established' at the time of [the] defendant's alleged misconduct." *Pearson*, 555 U.S. at 232.  "If the conduct did not violate a clearly established constitutional right, or if it was objectively reasonable for the [official] to believe that his conduct did not violate such a right, then the [official] is protected by qualified immunity." *Gilles*, 511 F.3d at 244; *see also DeFabio v. E. Hampton Union Free Sch. Dist.*, 623 F.3d 71, 77 (2d Cir. 2010).[17]

In determining if a right is clearly established, the Court looks to whether (1) it was defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has confirmed the

---

both state law and § 1983).  Alternatively, to the extent that this claim is brought under state law, the Court declines to exercise supplemental jurisdiction over it, pursuant to 28 U.S.C. § 1367(c). *See Hinds v. City of New York*, 768 F. Supp. 2d 512, 516 (S.D.N.Y. 2010) (declining to exercise supplemental jurisdiction over loss of services claim where § 1983 claims had been dismissed).

[17] Until recently, courts were required to perform the two-part qualified immunity inquiry in order, first asking whether the defendant violated a constitutional right and, if it was determined that a right was violated, only then asking whether that right was "clearly established." *See Saucier*, 533 U.S. at 201.  Following the Supreme Court's decision in *Pearson*, however, courts may now exercise their discretion in deciding the order in which to conduct the qualified immunity analysis. *See Pearson*, 555 U.S. at 236.

existence of the right, and (3) a reasonable defendant would have understood that his conduct was unlawful. *See Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011). "The question is not what a lawyer would learn or intuit from researching case law, but what a reasonable person in [the] defendant's position should know about the constitutionality of the conduct." *Young v. Cnty. of Fulton*, 160 F.3d 899, 903 (2d Cir. 1998). Moreover, when a qualified immunity defense is asserted, a court should consider the specific scope and nature of a defendant's qualified immunity claim. In particular, a determination of whether the right at issue was "clearly established" must be undertaken "in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. Thus, the qualified immunity analysis must be "'particularized'" in the sense that "'[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.'" *Zieper v. Metzinger*, 474 F.3d 60, 68 (2d Cir. 2007) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *see also Pena*, 432 F.3d at 114-15.

"[E]ven where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton*, 505 F.3d 161, 169-70 (2d Cir. 2007); *see also Kerman v. City of New York,* 374 F.3d 93, 109 (2d Cir. 2004). If "'[officials] of reasonable competence could disagree' on the legality of the action at issue in its particular factual context," then the defendant is entitled to qualified immunity, "[e]ven if the right at issue was clearly established in certain respects." *Walczyk*, 496 F.3d at 154. Qualified immunity analysis, moreover, is "objective"

31

rather than "subjective." *Anderson,* 483 U.S. at 641.  Thus, qualified immunity protects

government officials when they make "reasonable mistakes" about the legality of their actions,

*Saucier*, 533 U.S. at 206, and "applies regardless of whether the government official's error is a

mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact,"

*Pearson*, 555 U.S. at 231 (internal quotation marks omitted).  "In this respect, the Supreme

Court has observed that qualified immunity protects 'all but the plainly incompetent or those

who knowingly violate the law.'"  *Walczyk*, 496 F.3d at 154 (quoting *Malley v. Briggs*, 475 U.S.

335, 341 (1986)).  "Although a conclusion that the defendant official's conduct was objectively

reasonable as a matter of law may be appropriate where there is no dispute as to the material

historical facts, if there is such a dispute, the factual question must be resolved by the

factfinder."  *Kerman*, 374 F.3d at 109 (citations omitted).

 As discussed above, the Court concludes that Defendants did not violate Tashana's

substantive due process right to bodily integrity.  However, even if Defendants' actions were

deemed to have violated Tashana's rights, Defendants are entitled to summary judgment on

qualified immunity grounds.  "The Second Circuit has not been presented with a claim that

school officials violated substantive due process by failing to protect a student in their care."

*Murcko v. City of Shelton*, No. 02-CV-1291, 2005 WL 2663054, at *4 (D. Conn. Oct. 14, 2005).

And, while "the Second Circuit has not addressed the issue, circuits that have addressed this type

of case agree that schools have no duty under the Due Process Clause to protect students from

assaults by other students, even where the school knew or should have known of the danger

presented."  *Nieves v. Bd. of Educ.*, No. 06-CV-0603, 2006 WL 2989004, at *3 (E.D.N.Y. Sept.

15, 2006) (internal quotation marks omitted) (collecting cases); *see also Murcko*, 2005 WL

2663054, at *4 n.6 ("Plaintiff cites no case in which a school official's failure to prevent harm to

a student in his or her care was found to violate substantive due process.  When claims like this have been presented to federal courts of appeals, the claims have failed.") (collecting cases). Thus, the applicability of the state created danger exception to instances of student-on-student bullying and violence is very much an open question.

Beyond this, the scope and applicability of the state created danger exception, which to date has been applied by the Second Circuit only in cases involving law enforcement officials, (*Okin*, *Pena*, *Hemphill*, and *Dwares*), changed during the middle of the school year at issue in this case.  As discussed above, the Second Circuit, beginning in *Dwares*, had clearly found that the state created danger doctrine applied to instances where state actors affirmatively communicated to private actors that they would not face any consequences from inflicting harm on others.  It was not until *Pena*, however, that the Second Circuit first extended the doctrine to circumstances where state actors, by "repeated inaction . . . over a long period of time without an explicit statement of approval, might effectively constitute such an implicit 'prior assurance' that it rises to the level of an affirmative act."  *Pena*, 432 F.3d at 115.  In other words, "[a]fter *Dwares*, the law in this Circuit clearly provides that police officers who give express permission to a private citizen to injure another are violating the injured person's Due Process rights[,] [b]ut not until *Pena* . . . was it clearly settled that giving implicit permission for a private civil rights violation qualified as unconstitutional."  *Garcia v. Brown*, 442 F. Supp. 2d 132, 144 (S.D.N.Y. 2006).  Thus, because the *Pena* court recognized that it was adding a new layer of conduct covered by the state created danger exception first recognized in *Dwares*, it declined to apply its holding to the law enforcement officers in that case.  *Pena*, 432 F.3d at 115.

Of critical importance to this case, *Pena* was decided in December 2005, nearly half-way through the school year that is at the heart of this case, and after at least the first verbal encounter

between Tashana and the others, and after the first meeting that Artiles and Riback had with Unique to address that encounter.  It also was decided after Watkins and Monahan certified many of the inaccurate VADIR reports.  Of course, *Pena* was decided before other events, including the graduation incident and the meetings immediately preceding that encounter.  The "question, then, is whether the facts of this case are closer to those of *Dwares* than of *Pena*[:] [i]f the former, the right was clearly established at the time of the alleged wrongdoing; if the latter, it was not."  *Garcia*, 442 F. Supp. 2d at 145.  And, even if the conduct was similar to the former, a related question is whether it was objectively reasonable for Defendants, and, in particular, Artiles, to believe that his handling of the encounters between Tashana and Unique did not violate Tashana's right to bodily integrity.  The Court finds that the facts of the case more closely resemble the facts of *Pena*, and that even if they did not, that it would have been objectively reasonable for Artiles to believe that his actions did not violate Tashana's constitutional rights.

When Tashana first approached Artiles about her encounter with Unique and the other students, it was not clearly established that if Artiles simply chose to do nothing in response, he might be deemed to be violating Tashana's rights.  This is so for two reasons.  First, there is no allegation or even fair inference from the record that Artiles or any Defendant affirmatively communicated to Unique that she could continue to verbally taunt Tashana, let alone that she could join with others to physically assault Tashana and face no repercussions.  Second, as of the first meeting and, in fact, during the course of the entire school year, neither Tashana nor any other student reported that Unique or the other girls had engaged in any physical violence towards Tashana.  In other words, there was at that point no violation of Tashana's right to bodily integrity.

Artiles's conduct after *Pena* was decided does nothing to change the analysis. Assuming that it was clearly established while the ink was drying on *Pena* that repeated inaction by school officials that implicitly communicated a "prior assurance" to miscreants that their misdeeds will not be punished might violate a student's rights, it was objectively reasonable for Artiles to believe that his response (even if limited) to the verbal sparring between Tashana and Unique in no way communicated to Unique that was acceptable for her to engage in violent behavior towards Tashana. Here again, the context of the state "inaction" is relevant, as the actors and conduct in this case in no way resemble the type of law enforcement misconduct found to have created danger for § 1983 plaintiffs in the other previously-discussed Second Circuit cases. For example, there was no relationship between Artiles (or any Defendant) and Unique like there was between the law enforcement officers and the wrongdoers in *Pena* or *Okin* — i.e., no chummy discussion of football scores or drinking binges.[18] Instead, this case involves a school official exercising his discretion and judgment in determining what course of action to take in response to students who were clearly at odds with each other. As such, it presents the type of circumstance to which the qualified immunity defense typically applies, that is, where a public actor exercises his or her discretion in the performance of official duties in the reasonable belief

---

[18] This distinction thus makes the decision in *Okin* to reject qualified immunity for the defendants therein inapplicable here. In *Okin*, the panel decided that notwithstanding "several broad statements [in *Pena*] regarding what *Dwares* did or did not decide," *Pena* was not dispositive because it involved officers who encouraged "reckless" behavior by the wrongdoer, while the defendants in *Okin* encouraged "intentional" misconduct. 577 F.3d at 435-36. Indeed, the "broad statements" in *Pena* represented the Second Circuit's recognition that it was for the first time extending the state created danger doctrine to include "implicit" assurances arising from "repeated inaction" that might rise to the level of an "affirmative" act necessary to trigger the state created doctrine. In any event, *Okin* clearly involved a different dynamic between the state actors and the wrongdoers than in this case, and the instant action involves conduct (verbal abuse) that was nowhere near as serious as the ongoing domestic abuse at issue in that case.

that no wrong is being done.  *See Wyatt v. Cole*, 504 U.S. 158, 167 (1992) ("[W]e have

recognized qualified immunity for government officials where it was necessary to preserve their

ability to serve the public good or to ensure that talented candidates were not deterred by the

threat of damages suits from entering public service."); *Anderson*, 483 U.S. at 638 (qualified

immunity shields government officials "from civil damages liability as long as their actions

could reasonably have been thought consistent with the rights they are alleged to have violated").

This doctrine has no less meaning to school officials.  *See Wood v. Strickland*, 420 U.S. 308, 319

(1975) (denying qualified immunity to school board officials "would contribute not to principled

and fearless decision-making but to intimidation"); *see generally Davis v. Monroe Cnty. Bd. of*

*Educ.*, 526 U.S. 629, 648 (1999) ("[C]ourts should refrain from second-guessing the disciplinary

decisions made by school administrators."); *Bd. of Educ. Island Trees Union Free Sch. Dist. v.*

*Pico*, 457 U.S. 853, 864 (1982) ("[F]ederal courts should not ordinarily intervene in the

resolution of conflicts which arise in the daily operation of school systems." (internal quotation

marks omitted)).  Therefore, the Court finds that even if Plaintiffs could establish a violation of

Tashana's due process right to bodily integrity, the individual Defendants would be entitled to

qualified immunity.

### 3. Supervisory Liability of Defendants Watkins and Monahan

Although the Court has already found that Plaintiffs have failed to establish a violation of

Tashana's constitutional right to bodily integrity, and that the individual Defendants would

alternatively be entitled to qualified immunity, for the sake of thoroughness the Court addresses

Plaintiffs' claims against Watkins and Monahan based on a theory of supervisory liability, and

finds that they fail on the merits as well.  Under § 1983, a supervisor "cannot be held liable for

damages . . . merely because he held a high position of authority, but can be held liable if he was

personally involved in the alleged deprivation." *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 127 (2d Cir. 2004) (internal quotation marks omitted). Personal involvement may be established by demonstrating that

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* (alteration omitted). Plaintiffs claim that Watkins created the practice by which students at NRHS were not disciplined for their misbehavior (as reflected in the VADIRs that were certified by Watkins over the years), and that Monahan continued that practice even after becoming aware of its wrongfulness. (Pls.' Mem. 13-14.) Plaintiffs' claims, however, are misguided. There is no evidence in the record that Watkins had any direct involvement in establishing the alleged practice of failing to discipline misbehavior at NRHS, or at any other school in the District. In fact, Watkins testified that he believed the information contained in the VADIRs to be true and accurate when he certified them, and that he relied on assistants who he trusted in that regard. (Watkins Dep. 24:3-28:2.) Monahan similarly testified that he trusted the judgment of his subordinates, who compiled the data that was included in the 2005-2006 VADIR, which he certified, but which did not include the graduation day assault on Tashana. (Monahan Dep. 82:8-85:22.) Therefore, there is no evidence that Monahan actually became aware of what was going on at NRHS in terms of discipline and that he consciously chose to certify the inaccurate VADIR reports.

However, Plaintiffs argue that it is possible that Watkins, and later Monahan, may have been grossly negligent in supervising their subordinates at NRHS, and should have been aware of the misreporting of incidents that was occurring at the high school.  *See Poe v. Leonard*, 282 F.3d 123, 142 (2d Cir. 2002) (noting that the appropriate inquiry in determining the existence of gross negligence focuses on whether the supervisor "knew or should have known that there was a high degree of risk that [the subordinate would commit the wrong], but either deliberately or recklessly disregarded that risk by failing to take action that a reasonable supervisor would find necessary to prevent such a risk, and that failure caused a constitutional injury").  Both Defendants acknowledged that they did not thoroughly review the VADIRs before certifying their accuracy.  (Waktins Dep. 24:3-28:2; Monahan Dep. 103:3-17.)  Plaintiffs suggest that Watkins and Monahan should immediately have been tipped off that the VADIRs, which, on their face, were "incredibly ridiculous," were inaccurate, and thus that they were at least grossly negligent, and perhaps even complicit, when they certified the VADIRs as true and accurate.  As noted above, however, both Watkins and Monahan assert that they trusted their subordinates to prepare the VADIRs accurately, and therefore the Court cannot conclude that these Defendants acted recklessly in their supervision of the assistant principals at NRHS in the absence of any evidence in the record that there was any reason why the assistant principals should not have been trusted to do their jobs properly.  *Cf. Poe*, 282 F.3d at 146 (finding that plaintiff had failed to provide evidence sufficient to create a triable issue regarding defendant's gross negligence as a supervisor, even where plaintiff provided evidence that subordinate had potential predisposition for violating plaintiff's rights); *Lupinacci v. Pizighelli*, 588 F. Supp. 2d 242, 251-52 (D. Conn. 2008) (finding no gross negligence where plaintiff provided "absolutely no evidence" that defendant knew or should have known that defendant was prone to unlawful

behavior, and noting that a plaintiff cannot merely "claim that a [] supervisor commits 'gross negligence' in supervision when he delegates tasks to a subordinate").  This point is bolstered by the fact that no investigation of the District's VADIR reporting was ever initiated by the State Department of Education, which would likely have occurred if, as Plaintiffs claim, the District's VADIRs were "incredibly ridiculous" on their face.  (Defs.' 56.1 ¶ 139.)  Because there is no evidence that Watkins or Monahan knew, or should have known, that assistant principals at NRHS were improperly completing their VADIRs, they were not grossly negligent in their supervisory roles.  Accordingly, Plaintiff has failed to establish supervisory liability on the part of either Watkins or Monahan.

### 4. State Law Claims

Because Plaintiff's federal claims are dismissed, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims, pursuant to 28 U.S.C. § 1367(c)(3), which permits "[t]he district courts [to] decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." *See also George v. Reisdorf Bros.*, 410 F. App'x 382, 387 (2d Cir. 2011) (finding no abuse of discretion in district court's decision not to exercise supplemental jurisdiction over the plaintiffs' state law claim where summary judgment had been granted for the defendant, and finding that "[i]n general, where the federal claims are dismissed before trial, the state claims should be dismissed as well" (alteration in original) (quoting *N.Y. Mercantile Exch., Inc. v. Intercontinental Exch., Inc.*, 497 F.3d 109, 119 (2d Cir. 2007))); *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (noting that decision whether to exercise supplemental jurisdiction lies within the discretion of the district court).

### III. Conclusion

For the reasons stated herein, Defendants' motion for summary judgment is granted. Plaintiffs' federal claims are dismissed, and the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims. The Clerk of the Court is respectfully directed to terminate the pending motion (Dkt. No. 31), enter judgment for Defendants, and close this case.

SO ORDERED.

Dated:          White Plains, New York
                September 27, 2011

                                        KENNETH M. KARAS
                                        UNITED STATES DISTRICT JUDGE

40

Service List (via ECF):

Mary Brady Elizabeth Marzolla, Esq.
Brian A. Kelly, Esq.
Stephen Patrick Barry, Esq.
Feerick Lynch MacCartney
96 South Broadway
South Nyack, NY 10960
(845) 355-2000
Fax: (845) 353-2789
Email: mmarzolla@flmpllc.com
Email: sbarry@flmpllc.com
*Counsel for Plaintiffs*

Lewis R. Silverman, Esq.
Caroline B. Lineen, Esq.
Samantha Vélez, Esq.
Rutherford & Christie, LLP
369 Lexington Avenue, 8th Floor
New York, NY 10271
(212) 599-5799
Fax: (212) 599-5162
Email: lrs@rutherfordchristie.com
*Counsel for all Defendants*